IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:21-CV-20-FL

| | | |
|---|---|---|
| SEAN RAMBERT, SR., Co-Administrator of the Estate of Sean Michael Rambert, Jr., and DANIELLE COX RAMBERT, Co-Administrator of the Estate of Sean Michael Rambert, Jr., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | ORDER |
| v. | ) ) | (SEALED)[1] |
| CITY OF GREENVILLE, and DAVID BRANDON JOHNSON, in his individual and official capacities, | ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on defendants' motion for summary judgment as to all claims, predicated upon qualified immunity, pursuant to Federal Rule of Civil Procedure 56(a) (DE 21). The issues raised are ripe for ruling. For the following reasons, defendants' motion is denied.

## STATEMENT OF THE CASE

Plaintiffs commenced this action in the Superior Court of Pitt County, North Carolina, on February 3, 2021, alleging that defendant David Brandon Johnson ("Johnson"), an officer with defendant City of Greenville's ("Greenville") police department, shot and killed Sean Michael

---

[1] Within 14 days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, a redacted copy of this sealed order will be made a part of the public record.

Rambert, Jr. ("Rambert"), whose estate plaintiffs administer. In the operative complaint, filed July 9, 2021, subsequent to removal of the case, plaintiffs assert that defendant Johnson used excessive force in violation of the Fourth and Fourteenth Amendments and that this violation resulted from defendant Greenville's failure to properly train and supervise defendant Johnson, both claims as arising under 42 U.S.C. § 1983. Plaintiffs also assert claims of common law wrongful death, negligence, and assault and battery.

In support of their motion, defendants rely on: 1) the declaration of John Beardsley ("Beardsley"), an information services administrator for defendant Greenville; 2) a state court order allowing release of body-worn camera footage; 3) video from a body-worn camera ("body camera") worn by defendant Johnson, in unedited form ("Original Video"), digitally enhanced form ("Enhanced Video"), and in a form with slowed playback speed ("Slow-Mot. Video"), and still frames from that footage;[2] 4) notes from a "Computer Aided Dispatch Report" ("CAD"); 5) declaration and curriculum vitae of Toby Terpstra ("Terpstra"), who was retained by defense counsel to produce the edited versions of the footage from defendant Johnson's body camera; 6) excerpts of reports on the shooting by the State Bureau of Investigation ("SBI"); and 7) the autopsy report concerning Rambert's death. Defendants additionally rely on deposition testimony of defendant Johnson.

Plaintiffs' opposition to the instant motion makes reference to: 1) a video recording of the SBI's interview of defendant Johnson;[3] 2) summaries of the SBI interviews of a) Cameron Shane

---

[2] On May 17, 2021, the court allowed defendants to manually file certain video files via "flash drive." (Order (DE 30) at 1). Defendants manually filed, on May 24, 2021, a USB drive containing video from a body camera worn by defendant Johnson, as described in further detail herein. The court received a courtesy copy of the USB drive that same day.

[3] On September 28, 2021, the court allowed plaintiffs to also manually file certain video files via "flash drive." (Order (DE 56) at 1). Plaintiffs manually filed, on September 29, 2021, a USB drive containing video from the SBI's

Donaldson ("Donaldson"), a Greenville police officer who responded to the scene of the shooting, b) Courtney Harwood ("Harwood"), a resident of the neighborhood in which the shooting took place, c) Piper Lee Lyzak ("Lyzak"), another resident of that neighborhood, d) Kendric Carly Tilghman ("Tilghman"), the emergency medical technician who responded to the scene, and e) plaintiffs; 3) expert report of Gerald Takano ("Takano"); 4) a map of the area of the shooting; and 5) Greenville police department policies and procedures.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows.[4]  On July 9, 2019, at approximately 4:08 a.m., defendant Johnson responded to a call regarding a breaking-and-entering in progress at 2224-A Brookville Drive, Greenville, North Carolina, that involved glass breaking and a male voice outside the caller's residence.  (Pls.' Opp. Stmt. (DE 46) ¶¶ 7, 13).  Defendant Johnson was not the only officer responding to the call, and he knew that two other officers dispatched to the scene were five to seven minutes away.  (Id. ¶ 17).  Once defendant Johnson arrived close to the reported incident, he parked his patrol vehicle out of view and with his lights off, as to prevent the putative breaking-and-entering suspect from seeing his vehicle.  (Johnson Dep. (DE 42-1) at 49:2-19; 69:24-70:1).[5]  Per the police department's uniform, defendant was clad in a navy-blue short sleeve polo, with the department's shield in gold on his left chest, his "name tape" on his right

---

interview of defendant Johnson, as described in further detail herein.  The court received a courtesy copy of the USB drive that same day.

[4]     The undisputed facts are drawn from those portions of defendants' statement of facts that are admitted or undisputed by plaintiffs, as well as the body-camera footage of defendant Johnson described herein. Where a fact asserted in defendants' statement of material facts is undisputed, the court cites to plaintiffs' responsive statement of facts, where it indicates the fact is admitted, undisputed, or without opposing fact.  Further, page numbers in citations to documents and briefs in the record specify the page number imposed by the court's electronic case filing system ("CM/ECF") rather than the page number showing on the face of the document, if any.

[5]     Where a deposition is cited, the court relies on the pagination of the deposition transcript rather than the page number supplied by CM/ECF.

chest, and the department's "shield patches" on the polo's shoulders, and matching pants, along with his "duty belt." (Id. at 53:2-12; see also Pls.' Opp. Smt. (DE 46) ¶ 21; SBI Report Excerpts (DE 23-2) at 20-23, 36-39).

Defendant Johnson exited his vehicle at 4:08:35 a.m., at which point footage from his body camera begins, without audio. (Original Video 4:08:35).[6] He began walking towards where he believed the residence was located. (Id. at 4:08:36-53; see also Johnson Dep. (DE 42-1) at 47:7-11). Between 4:08:55 and 4:08:57 a.m., defendant Johnson activated his body camera upon hearing a loud yell, which turned on the camera's audio recording function and captured the 30 seconds of prior footage without audio. (Original Video at 4:08:55-57; Defs.' Stmt. (DE 43) at 12 n.5; Pls.' Opp. Stmt. (DE 46) ¶¶ 61-62.).

Defendant Johnson then drew his sidearm and began running towards the sound. At 4:09 a.m., the body camera footage captures another yell of an inarticulate, agitated-sounding male. (Original Video 4:09:00). Although the unedited video is too dark to determine what is happening at this time, defendant Johnson began to yell a mix of "Get on the ground!"; "Get on the ground right now!"; and "Get on the f***ing ground!" (Id. at 4:09:02-13).

Defendant Johnson later recounted that he witnessed "a black male with a white T-shirt" come from "out of the shadows next to a completed townhome and a townhome that was being constructed." (Johnson Interview 12:36-12:49;[7] see also Johnson Dep. (DE 42-1) at 95:1-96:20). This man, later determined to be Rambert, began yelling and moving toward defendant Johnson,

---

[6]     Where the original, unedited body camera video starts with the timestamp of 4:08 a.m., and continues six minutes and thirty seconds to the timestamp of 4:14 a.m., the court's citation relies on the timestamp on the face of the video, which is of undisputed accuracy.

[7]     Where video of defendant Johnson's SBI interview does not include a timestamp, the court's citations thereto rely on the time elapsed since the beginning of the video.

causing defendant Johnson to believe that Rambert was potentially "on drugs, experiencing a manic episode, or both." (Pls.' Opp. Stmt. (DE 46) ¶ 30).[8] Defendant Johnson did not see a weapon on Rambert as he rapidly approached. (Johnson Dep. (DE 42-1) at 70:11-16; see Defs.' Stmt. (DE 43) ¶ 31). Although the video makes clear that defendant Johnson began moving, it is not clear in what direction. (Original Video 4:09:03-11). He, however, recounted that he began to backpedal and yell the commands described above. (Johnson Dep. (DE 42-1) at 65:11-25). He also radioed in "I got one running at me!" (Original Video 4:09:11).

At 4:09:12 a.m., the video becomes clear enough to see that defendant Johnson is moving backwards and to his right as he moves underneath a light source, which he later described as a streetlight. (Id. at 4:09:12; Johnson Dep. (DE 42-1) at 65:10-12). Rambert continued to move toward defendant Johnson, as defendant Johnson repeated his yelled command for Rambert to get on the ground, during which time defendant Johnson raised his service weapon. (Original Video 4:09:12-14). When Rambert was, by defendant Johnson's estimate, five to seven feet away from defendant Johnson, he fired three shots at Rambert, who collapsed. (Id. at 4:09:14-16). Defendant Johnson, himself, fell over after he tripped backwards, discharging another, fourth, round into the air. (Id. at 4:09:16; Johnson Dep. (DE 42-1) at 76:3-6).

As defendant Johnson attempted to regain his footing, Rambert began to stand while continuing to moan and yell. (Original Video 4:09:16-19). After the initial shots, defendant Johnson could tell that Rambert was bleeding. (Johnson Interview 26:47-56). While still on the ground, defendant Johnson fired twice more (his fifth and sixth shots) at Rambert as he stumbled towards defendant Johnson. (Original Video 4:09:20-21). As Rambert continued to move forwards, still yelling, defendant Johnson fired twice again (his seventh and eighth shots) from the

---

[8]     Rambert, in fact, suffered from schizophrenia. (Pls.' Interview Report (DE 48-6) at 2).

ground, and Rambert fell once again. (Id. at 4:09:21-25; Video Stills (DE 21-1) at 11; see also Johnson Dep. (DE 42-1) at 78:23-79:7).

At this point, the body camera footage again becomes unclear as defendant Johnson's camera is facing upwards, intermittently swinging rapidly from left to right and back again. Rambert can be heard hoarsely stating something incomprehensible, followed by defendant Johnson radioing "524 [his unit number] shots fired." (Original Video 4:09:25-32; see also Pls.' Opp. Stmt. (DE 46) ¶ 82). Defendant Johnson recounted that Rambert was attempting to "climb up [defendant Johnson's] leg." (Johnson Interview 15:06-14). At one point, Rambert's face does appear in a frame of the footage with the night sky behind him. (Original Video 4:09:32; Video Stills (DE 23-1) at 12; see Pls.' Opp. Stmt. (DE 46) ¶ 83).

Defendant Johnson eventually separated himself from Rambert and proceeded to fire two more times (his ninth and tenth shots, the final shots fired) at Rambert on the ground as defendant Johnson gained his feet. (Original Video 4:09:38-41). Defendant Johnson then stood fully with his weapon trained on Rambert, yelling at Rambert to show his hands as Rambert rolled around, moaning, with blood soaking his shirt. (Id. at 4:09:41-49). Defendant Johnson then reloaded his weapon and radioed for emergency medical services, reporting shots fired and that he was okay. (Id. at 4:09:49-4:10:01). Rambert momentarily regained his footing, taking a handful of unsteady steps towards defendant Johnson, causing defendant Johnson to begin to yell at Rambert to get back on to the ground, before Rambert collapsed once again shortly after. (Id. at 4:10:02-11).

As Rambert then struggled on the ground, defendant Johnson communicated the situation by radio, shortly after which additional officers arrived. (Id. at 4:10:12-46). Rambert was rolled over and handcuffed by the later arriving officers. (Id. at 4:11:43-46). Rambert died at the scene. (Am. Answer (DE 40) ¶ 30). Rambert's later autopsy revealed that he had been shot seven times,

in the chest, left torso, abdomen, left shoulder (twice), right shoulder, and lower right back. (Autopsy Report (DE 23-2) at 1-2).

## COURT'S DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[9]

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's]

---

[9]    Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

    1.    Section 1983 Claim for Excessive Force

"[A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989); Hupp v. Cook, 931 F.3d 307, 321 (4th Cir. 2019) ("[P]olice officers are constitutionally permitted to use only that force which is reasonable under the circumstances."). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; see also Kingsley v. Hendrickson, 576 U.S. 389, 399, (2015) ("[A] court must judge the

reasonableness of the force used from the perspective and with the knowledge of the defendant officer."); Saucier v. Katz, 533 U.S. 194, 207 (2001) ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred"), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).

"The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). "[P]roper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; Kingsley, 576 U.S. at 397 (listing as relevant "[t]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting"). "[S]ubjective factors involving [the officer's] motives, intent, or propensities are not relevant." See Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994).

Here, defendant Johnson asserts a defense of qualified immunity. "Qualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier, 533 U.S. at 206.

"To overcome an official's claim of qualified immunity, the plaintiff must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Attkisson v. Holder, 925 F.3d 606, 623 (4th Cir. 2019)

9

(quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). The court "may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015). "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022).

      a.    Fourth Amendment Violations

"The intrusiveness of a seizure by means of deadly force is unmatched," Garner, 471 U.S. at 9, and, therefore, "[s]uch force is . . . justified only where a reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002); Elliott, 99 F.3d at 642. However, the "[o]fficer[] need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm — the Constitution does not require that certitude precede the act of self protection." Elliott, 99 F.3d at 644.

"Yet, [even] when an initial use of force is objectively reasonable, subsequent applications of force – even moments later – may not be." Harris v. Pittman, 927 F.3d 266, 272 (4th Cir. 2019); see Brockington v. Boykins, 637 F.3d 503, 507 (4th Cir. 2011) ("[I]t is possible to parse the sequence of events as they occur[.]"); Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). For example, "where an officer originally was justified in shooting at a suspect, the use of deadly force [may] bec[ome] objectively unreasonable once the suspect, disabled by the officer's initial shots, f[alls] to the ground." Id.

Considering the Supreme Court's guidance in Graham and its progeny, for reasons herein discussed, there is a genuine dispute of material fact regarding whether defendant Johnson's

10

multiple uses of deadly force during four distinct volleys of gunfire were justified, which, when resolved in plaintiffs' favor, would allow a jury to conclude that some or all of the gunshots were not reasonable.[10]

The court is mindful that where the record includes "facts . . . depicted by . . . videotape," it is guided by the Supreme Court's direction that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, [inclusive of video footage,] so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 381 (2007); Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape."). However, "[s]ummary judgment is proper under Scott only when there is evidence – like the videotape in Scott itself – of undisputed authenticity that shows some material element of the plaintiff's account to be blatantly and demonstrably false." Harris, 927 F.3d at 276.

The court finds the factor of whether Rambert posed an immediate threat of serious physical harm to the officer or others to be the most pertinent, and dispositive, when the facts are viewed in the light most favorable to plaintiffs.[11] The court turns to addressing the multiple components of that factor under the circumstances.

---

[10]    The fact that defendant Johnson fired his weapon a total of ten times does not, of course, per se establish any unreasonableness in his response. Elliot, 99 F.3d at 643 ("The number of shots by itself cannot be determinative as to whether the force used was reasonable.").

[11]    The severity of the suspected crime and the attempts of the officer to temper or to limit the amount of force used, exemplary considerations under Graham and Kingsley, although pertinent to the instant analysis, are most germane here insofar as they inform what type and the extent of threat an officer in defendant Johnson's position would perceive. See Smith v. Ray, 781 F.3d 95, 102 (4th Cir. 2015) (explaining that pertinent question as whether the "offense was . . . the type that would give an officer any reason to believe that [the decedent] was a potentially dangerous individual"); see, e.g., Knibbs v. Momphard, __ F.4th ___, 2022 WL 945713, at *8 (4th Cir. 2022). Therefore, those concepts are discussed herein where relevant, with this understanding.

i.      The Approach and Lead-Up

Consider the situation with which defendant Johnson was confronted in the moments before he pulled the trigger.  Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019) (directing the court to examine "the circumstances confronting the officer immediately prior to and at the very moment he fired his weapon," at the point of each shot).  Defendant Johnson, as he moved up the street, reasonably would know on the undisputed facts that a nighttime breaking-and-entering was in progress, glass had been broken, and occupants of a residence had heard a male voice outside. (Pls.' Opp. Stmt. (DE 46) ¶ 13).   From that, defendant Johnson reasonably could conclude that, after he appeared, Rambert, based on his loud yelling, was the same male whose voice was reported by the 911-caller heard outside of the home upon the glass break, resulting in a radio dispatch of a breaking and entering in progress.   That agitated individual now approached the officer, at a rapid pace, despite repeated calls by defendant Johnson to get on the ground.

The fact that Rambert did not heed defendant Johnson's directions to get on the ground does not, in and of itself, justify use of deadly force.  "Non-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect."  Estate of Jones ex rel. Jones v. City of Martinsburg, 961 F.3d 661, 670-71 (4th Cir. 2020).  Rather, "noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance."  Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 901 (4th Cir. 2016).

Looking to the risks posed by the resistance, an officer in defendant Johnson's stead was faced with a non-compliant, rapidly approaching but seemingly unarmed individual.  Compare Betton, 942 F.3d at 192 (explaining that the "[defendant-officer] shot [plaintiff], . . . without first identifying himself as a member of law enforcement or giving any commands to [plaintiff]").

12

Plaintiffs assert that the failure to comply must be understood in light of defendant Johnson's failure to warn he would use deadly force and the potential inability of Rambert to see that defendant Johnson was a police officer. Neither is meaningful here. "While a warning must be given before deadly force when feasible, it is not feasible to give a warning when there is an immediately threatened danger." Stanton, 25 F.4th at 235 n.6. And while plaintiffs assert that Rambert could not have seen defendant Johnson was a police officer, (see Pls.' Opp. Stmt. (DE 46) ¶ 37), the unedited footage from defendant Johnson's body camera indicates that, by the time defendant Johnson was under the streetlight and before he fired, the light provided a reasonable view of defendant Johnson's uniform. (Original Video 4:09:13-14); see also Iko, 535 F.3d at 230.

Instead, the risks posed by this resistance to defendant Johnson's orders can only be gleaned by examining the other pertinent considerations: the threat of violence Rambert presented as evinced by prior known or suspected conduct, the presence of any weapons, and the manner of his approach. Defendant Johnson knew or could reasonably suspect that, while the parties disagree as to what specific crime it would constitute, Rambert had broken the glass of a residence in what was described to the officer, by the dispatchers, as a breaking and entering. However, by the time defendant Johnson confronted Rambert, Rambert clearly was no longer, if he ever had been, inside the residence, and defendant Johnson had no indication that the 911-caller had been harmed or otherwise violently confronted.[12] And, as defendant Johnson, in fact, discerned, a reasonable officer would have recognized that, accepting a plaintiff-favorable inference, Rambert was in the midst of a manic episode or some other mental health crisis. (Defs.' Stmt. (DE 43) ¶ 30).

---

[12] While defendants rely on the finalized version of the CAD notes to contend otherwise, (Defs.' Stmt. (DE 43) ¶ 18), their cited deposition testimony does not demonstrate that this was version of the CAD notes that defendant Johnson viewed prior to leaving his patrol vehicle. (See Johnson Dep. (DE 41-2) at 47:3-5 (stating that he "checked . . . to see if there were any updated CAD notes" but not revealing what the contents of the CAD notes he actually viewed were)).

Rambert's "mental health was thus one of the facts and circumstances that a reasonable officer on the scene would ascertain[,] . . . [a]nd it is a fact that officers must account for when deciding when and how to use force." Estate of Armstrong, 810 F.3d at 900. As the Fourth Circuit has recognized, "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." Id. "[O]fficers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward." Id.

Taking a reasonable inference in plaintiffs' favor, upon witnessing behavior consistent with mental illness, especially with the paucity of further detail about the alleged break-in, a reasonable officer could have concluded that Rambert's mental illness was the cause for the 911-caller-described conduct. Columbia Union Coll. v. Clarke, 159 F.3d 151, 164 (4th Cir. 1998) ("Where the party challenging the grant of summary judgment can show that the inferences they suggest are reasonable in light of the competing inferences, summary judgment must be denied."). This would inform the officer's belief regarding such an individual's willingness to intentionally harm a law enforcement officer, where the individual seemingly was suffering a mental health episode and not in complete control of his actions. See Estate of Armstrong, 810 F.3d at 906; see also Palma v. Johns, 27 F.4th 419, 435 (6th Cir. 2022) ("[B]ehavior that ordinarily seems threatening may present a lower risk of harm if the officer has reason to believe that the behavior is a symptom of a mental condition.").

14

Further, on the facts viewed in the light most favorable to plaintiffs, resolving factual disputes in their favor, Rambert, as far as a reasonable officer in this instance could tell, was unarmed.  (See, e.g., Original Video 4:09:12-14; Johnson Dep. at 70:11-16; 83:16-22).  "[W]hile an officer of course may legitimately be <u>concerned</u> that a suspect is holding a weapon," he or she must "offer[] . . . [a] reason for actually <u>believing</u> [the suspect] had a weapon[.]"  <u>Smith</u>, 781 F.3d at 104-05.

The instant situation is analogous to <u>Clem</u> insofar as defendant Johnson has not testified he "saw [any]thing to even suggest that [Rambert] was armed—no bulges in his pockets or waistline, nor anything in his open shirt . . . [a]nd during the crucial moments immediately before the shooting," the video footage, especially when viewed in light most favorable to plaintiffs, indicates that "[Rambert's] hands were . . . empty, and that [he] never reached into his pockets or clothing."  284 F.3d at 551; (see also Johnson Dep. (DE 42-1) at 70:11-16; 83:16-22).  Accordingly, a reasonable officer would, as a starting point, have little cause to believe that Rambert was sufficiently dangerous by dint of a weapon as to justify the use of deadly force.

Defendants contend that a reasonable officer could have believed that Rambert possibly had a weapon on him as the suspected perpetrator of the breaking and entering.  (Defs.' Mem. (DE 44) at 11-12).  While an officer "need not be absolutely sure . . . of the nature of the threat," <u>Elliot</u>, 99 F.3d at 644, he or she must have more than a vague, inarticulable concern or supposition that a suspect is armed.  <u>Smith</u>, 781 F.3d at 104-105 (holding that plaintiff's refusal to show her hand did not give defendant-officer an actionable reason to believe the plaintiff had a weapon).  Instead, he or she must have an actual, appreciable reason, based on the observations an officer would or could reasonably make, that the suspect likely had a weapon.  See, e.g., <u>Wilcoxson v. Painter</u>, No. 5:13-CV-732-FL, 2016 WL 866327, at *6 (E.D.N.C. Mar. 3, 2016) (explaining that because

"plaintiff reached her right hand down to her ankle[and] . . . raised her clenched right hand by her face" before "rush[ing] towards [the defendant-officer]," the officer had a reasonable "fear[] that plaintiff had obscured within [her hands] a small weapon, such as a knife"). Particularly in this context, the fact that Rambert was the suspected perpetrator of the alleged breaking and entering does not make it so likely that he was armed that an officer would have a sound reason to think he represented an immediate, serious physical threat, in the way, for example, the suspect of an armed robbery could fairly be thought to be armed and dangerous.

Defendants assert that the weapon at issue is the one in defendant Johnson's hands that Rambert could have obtained at the end of his approach. Defendants rely on several out-of-circuit cases in support of their proposition. See, e.g., Wenzel v. City of Bourbon, 899 F.3d 598, 602 (8th Cir. 2018) ("[Defendant-officer] was required to make a split-second decision in unpredictable and dangerous circumstances, and he was not constitutionally required to attempt to re-holster his firearm, grab his baton or pepper spray canister, and do battle with the fast-approaching, known-to-be-confrontational [decedent]."); Mitchell v. Schlabach, 864 F.3d 416, 423 (6th Cir. 2017) ("[Defendant-officer] reasonably feared for his safety despite the fact that [decedent] may have been unarmed—[decedent's] aggressive approach suggested that he might well have attacked [defendant-officer] with his fists, or that he might have tried to wrestle for control of [defendant-officer's] gun so that he could use it against the officer."); DeLuna v. City of Rockford, 447 F.3d 1008, 1013 (7th Cir. 2006) ("[I]t was clear that the suspect was advancing on the officer in what reasonably appeared to be an effort to get his weapon, and that was sufficient for the court to determine that deadly force was reasonable to address the immediate threat to the officer's safety."); Carswell v. Borough of Homestead, 381 F.3d 235, 243 (3d Cir. 2004) ("A reasonable officer would not be expected to take the risk of being assaulted by a fleeing man who was so close

16

that he could grapple with him and seize the gun."). However, each case cited involved circumstances instructively distinguishable from those facing defendant Johnson.

First, in Mitchell, the decedent precipitated the arrival of the defendant-officer by "driving drunk after provoking an altercation with another individual." 864 F.3d at 421-22 (emphasis added). After a high-speed chase, ending in the decedent crashing his vehicle, he approached the defendant-officer, informing the officer he "was gonna have to f***ing shoot him." Id. at 419. The video recording of decedent and defendant-officer's interaction made it "clear that [decedent] intended a confrontation with [defendant-officer]" because he moved "toward [the officer] with speed, purpose, and confidence" after the threatening comment, approaching "aggressively . . . with [c]lenched fists, wide eyes, coming directly in . . . towards [the officer], . . . refusing to listen to any of [his] direct commands." Id. at 419, 421-22. As later opinions of the United States Court of Appeals for Sixth Circuit make clear, "deadly force is not justified 'whenever a suspect charges at an officer or defies an order.'" Palma, 27 F.4th at 435 (quoting Mitchell, 864 F.3d at 424).

Similarly, in DeLuna, the decedent's aggressive conduct, his causing a "domestic disturbance," occasioned the arrival of the officer. 447 F.3d at 1010. Once confronted, the decedent informed the officer "I've got something for you. You are going to have to kill me." Id. at 1011. The decedent "had a history of violence, and . . . was known to both carry and sell weapons." Id. at 1012. He made the "subsequent statement that if [the officer] was going to shoot [decedent], he should shoot [decedent] in the chest," which "further indicated that this was a dangerous situation, both in its anticipation of violence and in its implication that the shot had better be fatal." Id. Finally, "the action of [decedent] lunging towards [the officer] after the threats and bizarre conduct, established the real danger of imminent serious bodily injury should [decedent] succeed in reaching [the officer]." Id. at 1013.

17

As to Carswell, the officer was confronted with a charging suspect that had already escaped from an armed policeman and whose confrontation with the police was caused by his repeatedly and violently violating his estranged wife's protection-from-abuse order against him that evening and his threatening his estranged wife. 381 F.3d at 238, 243. The officer in Carswell was confronted with a suspect, who had on numerous occasions that night demonstrated his willingness to violate the law, violently, and to escape the legal ramifications of his actions by any means necessary. And, finally, in Wenzel, the officer knew of defendant's "aggressiveness and of his violence towards law enforcement officers," which was followed by an "indisputably aggressive approach" that was reasonably viewed "a precursor to a physical altercation." 899 F.3d at 602; see also id. at 600 (explaining that the officer had been told by decedent's relative that the decedent had stated "he was 'not going back to jail'").

In sum, the cases relied upon by defendants arose in circumstances where it was either unclear whether the decedent-suspect was actually armed or he had demonstrably and repeatedly given the responding officers reason to be believe that he was ready, able, and willing to commit violence against the officers, potentially by wresting an officer's drawn weapon away. However, a jury reasonably could find that was not the situation that defendant Johnson was faced with when he began firing at Rambert.

As revealed by his body camera's footage, an officer in defendant Johnson's position was confronted with a rapidly approaching, agitated or distressed individual who did not seemingly understand or wish to comply with his instructions. Yet, the evidence, when disputed factual issues are resolved in plaintiffs' favor and viewed in light of all reasonable inferences in their favor, see Rogers v. Pendleton, 249 F.3d 279, 293 (4th Cir. 2001), shows a suspect who, while approaching, had not demonstrated via his known history, suspected criminal activity, or immediately preceding

18

conduct a willingness to inflict violence on others nor the purpose and confidence of approach such that his intent to manufacture a violent confrontation was obvious.  See, e.g., Stanton, 25 F.4th at 229 (explaining where "[decedent] did not have a gun in his hands[] [b]ut his conduct earlier in the encounter, including threats of violence and erratic behavior, added to the sudden hand movements, [there] may well have been sufficient justification for [defendant-officer's] split-second decision to use deadly force").

The facts, viewed in the light proper for this restricted procedural posture, could allow a jury to conclude that even defendant Johnson's initial firing on an unarmed individual conspicuously exhibiting mental instability was a disproportionate use of force in light of all the circumstances, despite Rambert's agitated, running approach.  See also Estate of Armstrong, 810 F.3d at 909 ("Erratic behavior and mental illness do not necessarily create a safety risk[.]"); Palma, 27 F.4th at 437.  While Rambert's rapid approach may have put an officer in reasonable fear of some threat, the facts presented by plaintiffs that Rambert was not apparently or reasonably thought to be armed and was mentally ill are ones that could lead a jury to conclude that defendant Johnson's initial three-shot volley was an unreasonable amount of force to use in the face of the threat that faced him.

ii.    Later Shots

Even assuming that defendant Johnson's initial gunshots could be described as a proportionate response to Rambert's approach, his subsequent salvoes of gunfire became increasingly excessive when viewing the facts in the light most favorable to plaintiffs.  See Harris, 927 F.3d at 274 ("That shots are fired in rapid succession . . . is not enough to establish, as a matter of law, that the risk of physical harm to [the officer] that supported the first shot still existed at the time of the second and third.").  Although defendants dispute whether defendant Johnson knew

19

that his initial shots connected, the video evidence reasonably viewed in plaintiffs' favor would allow the jury to permissibly infer that Rambert's immediate collapse after the gunshots was indicative of, and would indicate to a reasonable officer, the shots hitting Rambert. (Original Video 4:09:16); see also Harris, 927 F.3d at 276 ("Scott . . . does not abrogate the proper summary judgment analysis, which in qualified immunity cases usually means adopting the plaintiff's version of the facts[] . . . [even] in the face of documentary evidence that lends support to a government official's account of events or even makes it unlikely that the plaintiff's account is true.").

While defendants characterize Rambert's actions following the initial four shots as "coming at [defendant Johnson] again while [he] was still on his back," (Defs.' Stmt. (DE 43) ¶ 43), "[d]rawing a reasonable inference in [plaintiffs'] favor, a jury could find" Rambert's "'stumbl[ing]' a few steps toward [the officer]" to be "non-threatening," at least to a degree that additional deadly force was not required to be used on an individual who had already been shot. Wilson v. Prince George's County, 893 F.3d 213, 220 n.8 (4th Cir. 2018); Clem, 284 F.3d at 548 (explaining that where disputed testimony recounted that the decedent "'step[pped]' in an awkward manner" towards defendant-officer, there was a genuine "dispute as to whether [decedent] could have appeared threatening to a reasonable officer in the position of [defendant officer]"); see also Palma, 27 F.4th at 441-42 ("These factual disputes are material because they concern the nature of any movement that [decedent] may have made just before the shooting.").

Yet, in the wake of Rambert's further movement, defendant Johnson fired. Again, Rambert jerked, twisted, and reacted immediately to defendant Johnson's fifth and sixth shots, (Original Video 4:09:20), as would lead an officer to reasonably believe at least one of his or her shots had connected. Defendant Johnson was then faced with an unarmed, mentally ill individual who had

20

been shot twice in areas of his body sufficient to cause him to collapse. Rambert's subsequent stumbles forward evidenced in the body camera footage could thus provide a basis for the jury to view the ensuing use of deadly force as unreasonable, if it concluded that this movement was non-threatening and indicative of Rambert's partial incapacitation by the gunfire.[13] If the jury concluded that Rambert was sufficiently incapacitated to not pose a threat of serious physical harm after the initial rounds of gunfire, defendant Johnson's continued use of deadly force after Rambert's effective incapacitation was without reason, let alone based on sound reason to believe he was a serious threat. Harris, 927 F.3d at 275; Palma, 27 F.4th at 441-42.

A reasonable juror's conviction of such could further solidify after defendant Johnson's seventh and eighth shots at Rambert as he staggered and stumbled forward, which caused him to "fall[] on defendant Johnson." (Johnson Dep. (DE 42-1) at 80:12-17); see also Connor v. Thompson, 647 F. App'x 231, 238 (4th Cir. 2016) ("Evidence that an individual can barely walk contravenes a police officer's argument that deadly force was necessitated by the risk that the individual might charge and attack the officer."). Thus, an officer in defendant Johnson's position would have reason to believe that yet another gunshot had hit Rambert. After this, the footage becomes confused, although it is clear that defendant Johnson and Rambert are interacting in some way. (See Original Video 4:09:24-38). Defendant Johnson, at one point during this time, felt in command enough of the situation to radio in that shots had been fired. (Id. at 4:09:31). He was eventually able to create distance between Rambert and himself, as he found his footing. (Id. at 4:09:38).

---

[13]     Further, while not controlling, defendant Johnson's later decision to not further fire on Rambert after he eventually, momentarily, regained his footing after the ninth and tenth shots and stumbled towards defendant Johnson could be inferred by a jury to reflect an understanding of this concept in some part. (See Original Video 4:10:03-12).

Although defendants dispute such, (Defs.' Stmt. (DE 43) ¶¶ 48-49), the jury could find that at this point, as Rambert seemingly lay on the ground, (Original Video at 4:09:39; see also Johnson Dep. (DE 42-1) at 100:6-11, 103:5-11), "it would have been evident to [defendant Johnson] . . . that [Rambert] was badly wounded and subdued." See Harris, 927 F.3d at 275. However, defendant Johnson fired two additional shots at Rambert after this point, at least one of which hit Rambert. (Defs.' Stmt. (DE 43) ¶ 49). These final uses of deadly force are ones which a reasonable juror could conclude were excessive as they occurred after an unarmed man had been shot at least three times by an officer who had managed to separate himself from the individual and was regaining his footing more quickly than the badly wounded suspect, if the video footage is viewed in the light most favorable to plaintiffs. See, e.g., Brockington, 637 F.3d at 507 ("There is no indication that deadly force was necessary or reasonable once [plaintiff] was initially shot, thrown to the ground by the force of the bullets, and wounded.").

In so holding, the court recognizes the important axiom "that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. However, this axiom does not derogate the court's duty when presented with a motion for summary judgment to decide whether fact issues remain for trial, and when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," meaning that judgment as a matter of law should be denied. Myrick, 395 F.3d at 489-90.

Here, the video evidence is susceptible to more than one reasonable inference regarding the proportionality of the force defendant Johnson used against Rambert based on the threat an officer in his situation would ascertain. The jury, increasingly so after each successive volley,

could conclude at some point that deadly force was excessive under these circumstances. Waterman, 393 F.3d at 481. Thus, a genuine dispute of material fact remains on plaintiffs' claim of excessive force under the Fourth Amendment, as incorporated by the Fourteenth Amendment.

Defendants nonetheless seek to analogize the instant case to that facing the court in Wilcoxson v. Painter. The analogy is an unconvincing one. In that case, issues concerned officers' use of deadly force, which ceased when the plaintiff was no longer reasonably determined to be a serious threat, against an individual who, while acting strangely, was not considered mentally ill by the responding officers, potentially threatened the officers, and reached for what reasonably seemed to be a concealed weapon before charging. See Wilcoxson, 2016 WL 866327, at *6-8. The fact that "events unfold[] rapidly," (Defs.' Mem. (DE 44) at 21 (quoting Wilcoxson, 2016 WL 866327, at *7)), does not in and of itself justify deadly force. See, e.g., Waterman, 393 F.3d at 481 ("[T]he reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds.").

Further, defendants' reliance on Wilcoxson in this instance, to support argument that Rambert's perceived resilience to gunshot wounds makes him per se a deadly threat, (see, e.g., Defs.' Mem. (DE 44) at 15-17), misunderstands the scope and import of the uncontroversial principle that additional deadly force may be justified where a deadly threat has not been eliminated, compare, e.g., Elliot, 99 F.3d at 643 (explaining that the officers "sought to ensure the elimination of a deadly threat"), with Wilcoxson, 2016 WL 866327, at *8 ("Defendant . . . had further cause to fear immediate harm when plaintiff failed to stop charging towards her despite multiple gunshots to her torso."). Defendant's assertion also stands in tension with the Fourth Circuit's recent guidance in Harris that a "conclu[sion] that [the decedent] showed himself to be uniquely threatening when he proved impervious to two previous taser strikes . . . [was] an[]

23

inference improperly drawn in [the moving defendant's] favor." 927 F.3d at 275 ("[E]ven if a jury could draw this inference in [defendant's] favor, the district court on summary judgment could not.").

In sum, the court concludes that, under the first prong of the qualified immunity analysis, plaintiffs have demonstrated that if the facts are viewed in their favor, a jury reasonably could infer that at least some of defendant Johnson's use of deadly force was unreasonable. The court turns next to the second prong of the qualified immunity analysis.

        b.     Clearly Established Rights

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 170 (4th Cir. 2016). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). This "do[es] not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." Al–Kidd, 563 U.S. at 741.

In the context of an excessive force claim, the right that needs to be clearly established is not the "general" right to be free from excessive force; rather, the court's inquiry should focus on "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation she confronted." Mullenix v. Luna, 577 U.S. 7, 12-13 (2015) (per curiam); see, e.g., Betton, 942 F.3d at 194 (framing the relevant inquiry as "whether it was clearly established in April 2015 that shooting an individual was an unconstitutional use of excessive force after the officer: (1) came onto a suspect's property; (2) forcibly entered the suspect's home while failing to identify himself as a member of law enforcement; (3) observed inside the home an individual

24

holding a firearm at his side; and (4) failed to give any verbal commands to that individual"). Accordingly, the court focuses its inquiry on "whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." Rowland, 42 F.3d at 173; McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) ("[I]f a reasonable officer possessing the same particularized information as [defendant government official] could have, in light of [then-controlling law], believed that his conduct was lawful, then [defendant government official] is entitled to qualified immunity.").

While both this inquiry and the above excessive force inquiry "rely on an objective appraisal of the reasonableness of the force employed," Rowland, 41 F.3d at 173, they are doctrinally distinct. Saucier, 533 U.S. at 205. The Supreme Court has explained the distinction as follows: "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed," defeating an excessive force claim on the merits. Id. at 205. In contrast, "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Id.

Looking to "the specific context of the case" to determine "whether the violative nature of [defendant Johnson's] particular conduct [was] clearly established," Mullenix, 577 U.S. at 12, defendant Johnson was confronted with three separate factual scenarios presenting the dilemma of whether deadly force was reasonable, and therefore legal: first, the quick approach of an unarmed but noncompliant individual, suspected of breaking and entering, in the midst of an apparent mental health crisis, when defendant Johnson was the lone officer; second, the stumbling forward movement of an unarmed, now wounded, individual, who previously rapidly moved towards the

officer, while the officer is on the ground; and _finally_, an unarmed individual's raising himself on his elbows, after being shot at least, three times, as an officer regains his own footing at the same time after having created distance from the suspect.

An officer in defendant's position in the first two scenarios reasonably could have concluded that "pre-existing law" did not make "the unlawfulness" of deadly force apparent, Estate of Armstrong, 810 F.3d at 907, although the court still holds that plaintiffs have demonstrated that a reasonable jury could resolve factual disputes in their favor and find that defendant Johnson used excessive force in some of his initial eight shots. See generally id. at 909 (explaining the benefits of adjudicating the merits of a plaintiff's claims for constitutional violations even where concluding qualified immunity applies); Wilson, 893 F.3d at 224. However, viewing the facts in the light most favorable to plaintiffs, the scenario facing defendant Johnson when he fired his final two shots was one that would cause a reasonable officer to understand that what he was doing violated Rambert's Fourth Amendment right against excessive force, as clearly established by then-controlling law.

As early as 2005, controlling precedent "clearly established . . . that an officer may not use deadly force in the seconds after a serious threat ha[s] abated." Waterman, 393 F.3d at 482-83. In the months before defendant Johnson shot Rambert, the Fourth Circuit explained that "it is clear that even a police officer who has just survived a harrowing encounter that necessitated the use of deadly force to extricate himself may not continue to use deadly force once he has reason to know that his would-be assailant is lying on the ground wounded and unarmed." Harris, 927 F.3d at 281. "Indeed, it is just common sense that [shooting] someone who is already incapacitated is not justified under these circumstances." Brockington, 637 F.3d at 508.

Taking the reasonable inferences from the body camera footage in plaintiffs' favor, defendant Johnson "'knew or should have known' that [Rambert] no longer posed an imminent threat to his safety that justified the further use of deadly force" after defendant Johnson separated himself from Rambert, and began to stand, and Rambert, bleeding profusely from at least three gunshot wounds, did no more than raise himself up on his elbows. <u>Harris</u>, 927 F.3d at 280. This understanding is informed by the Fourth Circuit's decision in <u>Harris</u>, which while not factually identical, <u>see</u> <u>Wilson</u>, 893 F.3d at 221 ("A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity."), is "pre-existing law" in light of which "the unlawfulness [of firing at Rambert a ninth and tenth time]" would "be apparent." <u>Dean ex. rel. Harkness v. McKinney</u>, 976 F.3d 407, 417 (4th Cir. 2020).

In <u>Harris</u>, the officer was faced with a situation where "<u>after</u> a hand-to-hand struggle over [the officer's] gun[,] . . . [the officer] gained control over the weapon, used it to shoot [plaintiff] once in the chest, and <u>then</u>, after [plaintiff] fell to the ground badly wounded, stood over [plaintiff] and shot him twice more." 927 F.3d at 276. Neither party there disputed that the initial shot to plaintiff's chest was justified after the violent fight over the officer's weapon, <u>id.</u> at 272, but the court held that, in light of the procedural posture of summary judgment, the facts would allow a jury to conclude that "the threat posed to [the officer] by [plaintiff] as they struggled for control of his weapon . . . was neutralized" after plaintiff "had been knocked to the ground with a gunshot wound to his chest," "rendering [the officer's] final two shots objectively unreasonable and thus constitutionally excessive." <u>Id.</u> at 279. The court further concluded that this violated plaintiff's clearly established rights where "<u>Waterman</u> . . . was sufficiently specific to clearly establish the

right of a suspect, once shot by an officer and lying wounded on the ground, not to be shot again." Id. at 281.

Here, like Harris, "[t]his is not a case . . . in which an officer would be required to reason backward from case law 'at a high level of generality' to determine whether his conduct violated a constitutional right." Id. The record, on "adopti[on] [of] . . . the plaintiff[s'] version of the facts," Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011), allows for the reasonable conclusion that defendant Johnson, after creating distance between himself and Rambert and while standing to his feet, shot Rambert twice as Rambert sat or lay on the ground wounded, when he no longer, if ever, presented a threat of serious physical harm. Thus, a reasonable officer in defendant Johnson's position would have known that these additional shots violated the law, as clearly established by the time of Harris, "that even a police officer who has just survived a harrowing encounter that necessitated the use of deadly force to extricate himself may not continue to use deadly force once he has reason to know that his would-be assailant is lying on the ground wounded and unarmed." 927 F.3d at 281.

The facts that defendant Johnson had not come to a complete standing position and that Rambert was not laying with his back facing defendant Johnson do not take the instant situation so far out of reach of Harris and the above law as to make muddy these otherwise clearly established principles. See Betton, 942 F.3d at 193-94 ("The key inquiry in this regard is not whether one of these courts has considered identical factual circumstances and held that an officer's conduct violated particular constitutional rights. Instead, we consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights.").

The court therefore concludes that defendant Johnson is not entitled to qualified immunity on his motion for summary judgment.

2.  Remaining Claims

Defendants premise their brief arguments in favor of judgment as a matter of law on plaintiffs' other claims on a finding of qualified immunity for defendant Johnson. (See Defs.' Mem. (DE 44) at 3, 23). Thus, where the court holds that qualified immunity is improper at this stage for defendant Johnson, it similarly rejects defendants' arguments contingent thereon.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 21) is DENIED. The partial stay of discovery implemented by the court's May 26, 2021, order is lifted. (DE 32). The parties are DIRECTED to confer, pursuant to Rule 26(f), hold a discovery conference, and then file, within 21 days of the date of this order, a proposed plan for remaining discovery, conduct of mediation or some other alternative dispute resolution technique(s), and deadlines for any remaining motions.

SO ORDERED, this the 31st day of March, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge